FILED

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

00 AUG 18 PM 4: 38

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JEROME GIDDENS, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV-99-H-1005-NE |
| SWIFT TRANSPORTATION COMPANY, INC., | ) | |
| | ) | |
| DEFENDANT. | | |

ENTERED

AUG 1 8 2000

### MEMORANDUM OF DECISION

The Court has before it the June 30, 2000 motion of
defendant Swift Transportation Company, Inc. for summary
judgment.  Pursuant to the Court's July 5, 2000 order, the motion
was deemed submitted, without oral argument, on August 2, 2000.

### I. Procedural History

Plaintiff Jerome Giddens commenced this action on April 22,
1999 by filing a complaint in this Court alleging that his
employer is liable for racial slurs made by plaintiff's
supervisor.  (See Compl. ¶ 7.)  Plaintiff contended that
defendant's alleged conduct constitutes (1) racial discrimination
in the form of harassment[1] under Title VII; (2) racial

---

[1] The plaintiff's primary federal claims under Title VII and
Section 1981 are based on allegations of racial discrimination in
the form of hostile work environment harassment.  Although
plaintiff mentions a claim for "disparate terms and conditions of

discrimination in the form of harassment under 42 U.S.C. § 1981;

(3) negligent training, supervision, and retention under state

law; and (4) outrage under state law.  (See Compl. Counts I, II,

V, VI.[2])  Defendant's June 30, 2000 motion for summary judgment

asserts that no genuine issue of material fact exists and that

defendant is entitled to judgment as a matter of law.  (See

Def.'s Mot. Summ. J.)

The parties have each filed briefs and submitted evidence in

support of their respective positions concerning the pending

motion for summary judgment.  On July 11, 2000, defendant

---

employment" in his complaint, (see Compl. ¶ 9), both the evidence
and plaintiff's argument center on the hostile work environment
claim.  Furthermore, plaintiff's reliance on case law dealing
with an employer's motivation and intent, while probative with
respect to a disparate treatment claim, is not germane to the
claim of hostile work environment.  (See Pl.'s Mem. Opp'n Summ.
J. at 4-14.)  Apparently the plaintiff's dependence on
inapplicable case law is attributable to the lack of consistent
case law supporting plaintiff's position.  (See Pl.'s Mem. Opp'n
Summ. J. at 16.) Plaintiff argues for a change in the law
regarding the creation of a "hostile environment" and admits that
his position is inconsistent with current case law, including
Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  (See Pl.'s
Mem. Opp'n Summ. J. at 16)("A reasonable jury could find that the
use of the 'nigger' word by a white supervisor to an African
American subordinate creates a hostile or abusive environment.
This conclusion is not unreasonable although this is inconsistent
with current law.") Unfortunately for the plaintiff, this court
does not have the authority to overrule precedent set by the
Supreme Court and the Eleventh Circuit.

[2] Plaintiff skips counts III and IV in his complaint.

submitted evidence[3] in support of the motion and on July 19,

2000, defendant filed a supporting memorandum of law.  Plaintiff

submitted evidence[4] in opposition to the motion on July 26, 2000

and filed an opposing brief on August 3, 2000.  On August 4,

2000, defendant filed a reply brief in support of the motion for

summary judgment.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary

judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

---

[3] Defendant submitted the June 27, 2000 affidavit of Tim
Harrington; the June 27, 2000 affidavit of Kirk Williams;
excerpts from the May 19, 2000 deposition of Jerome Giddens with
exhibits; excerpts from the March 3, 2000 deposition of Carl
Foster; and excerpts from the March 3, 2000 deposition of Harold
M. Kelley.

[4] Plaintiff submitted the March 3, 2000 deposition of Carl
Foster; the personnel file of Harold M. Kelley; the March 3, 2000
deposition of Harold M. Kelley; the Swift Policies and Procedures
Driver Handbook, revised 1998; the EEOC file on charge # 130-99-
0358; the January 19, 1999 Statement of Position of Swift to
charge # 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; the Defendant's Answer filed June 21, 1999;
the plaintiff's October 26, 1998 EEOC Charge of Discrimination;
the October 6, 1998 Employee Discipline Report of Harold M.
Kelley; the narrative of incidents against Jerome Giddens hand-
written by Jerome Giddens; the November 29, 1998 letter from
Harold M. Kelley to Swift Transportation Company, Inc.; the May
19, 2000 deposition of Jerome Giddens; the June 27, 2000
deposition of Timothy S. Harrington; the June 27, 2000 deposition
of Sheryle Puckett-Woehler; and the June 27, 2000 deposition of
Kirk L. Williams.

3

material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to

4

discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of

evidence in the record to support a judgment for the non-moving
party on the issue in question.  This method requires more than a
simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's
claim; it simply requires that the movant point out to the
district court that there is an absence of evidence to support
the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.
If the movant meets its initial burden by using this second
method, the non-moving party may either point out to the court
record evidence, overlooked or ignored by the movant, sufficient
to withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)
(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561
(1992)).

### III. Relevant Undisputed Facts[5]

Plaintiff, a black male, works as an "over-the-road" truck

---

[5] If facts are in dispute, they are stated in the manner
most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at
1115.

6

driver for the Ellenwood, Georgia terminal of Swift
Transportation Company, Inc.  (See Dep. of Jerome Giddens 10,
23.)  Before beginning work for defendant, plaintiff attended
orientation classes in Greer, South Carolina for approximately
two days, (see id. at 13), during which time plaintiff received a
copy of the Swift Policies and Procedures Driver Handbook ("the
handbook") containing defendant's anti-harassment policy, (see
id. at 14; Def.'s Ex. 4 to Dep. of Jerome Giddens 14-15).  The
definition of "harassment" located in the handbook included
"sexual harassment, as well as harassment based on such factors
as gender, race, color, religion, national origin, ancestry, age,
disability, or veteran status."  (Def.'s Ex. 4 to Dep. of Jerome
Giddens 14-15.)  The handbook instructed victims of harassment to
call the director of human resources at the listed phone number.
(See Def.'s Ex. 4 to Dep. of Jerome Giddens 14-15.)  During
orientation, defendant provided plaintiff with the phone numbers
of Al Snells and Carl Foster, among others, to call should he
encounter problems while on the road after training.  (See Dep.
of Jerome Giddens 20-24.)

Plaintiff signed a paper acknowledging receipt of the
handbook and promising to read the handbook and contact Human
Resources with any questions. (See id. 14-15; Def.'s Ex. 3 to
Dep. of Jerome Giddens 14-15.)  Plaintiff cannot recall whether

defendant covered the anti-discrimination policy during the orientation process, (see Dep. of Jerome Giddens 16-17), but is certain that no EEOC representative spoke about harassment or discrimination, (see id. at 17).  Plaintiff had no personal knowledge of defendant's policy against racial harassment until after the incidents alleged in the complaint occurred. (See id.)

After orientation, Swift assigned Harold Matt Kelley, a white male, to train plaintiff. (See id. at 25-26.)  Defendant hired Kelley approximately fourteen months prior to the hiring of plaintiff and released Kelley to solo driving status approximately twelve months prior to Kelley's training of plaintiff.  (See Personnel File of Harold M. Kelley.)  Kelley served as plaintiff's trainer, but plaintiff considered Kelley to be the person in charge of his employment during the training period.  (See Dep. of Jerome Giddens 25-26.)  Plaintiff's position is that Kelley was plaintiff's supervisor.[6]  (See Pl.'s Mem. Opp'n Summ. J. at 15-16.)

Plaintiff alleges that Kelley first harassed him shortly

_____

[6] Defendant strongly contests plaintiff's assertion that Kelley was plaintiff's supervisor and points to the fact that Kelley had no supervisory authority to "hire, fire, promote, demote, discipline, or alter the terms of employment of any employee." (Aff. of Tim Harrington; Aff. of Kirk Williams.)  It is defendant's position that Al Snells was plaintiff's immediate supervisor.  (See Dep. of Carl Foster 29.)  Snells, a black male, was the developmental plant manager.  (See id.)

after plaintiff's training began.  (See Dep. of Jerome Giddens
27-29.)  During a discussion of cars, plaintiff told Kelley that
he did not like Fords because he had experienced so many problems
with them.  (See id. at 29.)  Plaintiff went on to say that
"Ford" stood for "Found On Road Dead."  (Id.)  Kelley then told
plaintiff that "Pontiac" stood for "Poor Old Nigger Thinks It's A
Cadillac."  (Id.)  Plaintiff informed Kelley that he did not
appreciate Kelley's statement and Kelley apologized, although
Kelley stated he that he saw nothing wrong with the statement.
(See id. at 29-30.)  During a discussion of jails and the cost of
inmates a few days later, Kelley told plaintiff that most of the
people in jail are black and that "they all need to be killed
anyhow because of the waste of tax payers' money and all that."
(Id. at 36.)

    Plaintiff further alleges that Kelley "would always holler
and cuss at you."  (Id. at 37.)  While driving one day, Kelley
yelled at another driver who "cut him off" and called her a
"stupid ass nigger."  (Id. at 39.)  After Kelley's comment to the
other driver, plaintiff explained that the word "nigger" was
offensive and shared his experiences with racism as a child.
(See id. at 42-49.)  Kelley apologized and promised not to use
the word "nigger" again.  (See id. at 49.)  Plaintiff admits that
Kelley never used the word again in plaintiff's presence.  (See

id.)  Plaintiff alleges that Kelley subsequently referred to Hispanics as "wetbacks."  (See id. at 50.)

On a later trip, the two men stopped at Kelley's house in Mobile, Alabama and Kelley told plaintiff to wait outside.  (See id. at 62.)  Plaintiff asked to use the restroom and Kelley told him to "use it outside."[7]  (Dep. of Jerome Giddens 62.) Plaintiff alleges that he waited for six to eight hours outside Kelley's house before Kelley returned.  (See id. at 63.)  Later, plaintiff asked Kelley if he had ever allowed any black trainers to enter his house;[8] Kelley said "no" and told plaintiff that "my wife doesn't like blacks in there, my wife doesn't care for them in there."  (Id. at 74.)

After an incident at a truck stop when plaintiff and Kelley cursed one another, plaintiff accused Kelley of being prejudiced and told Kelley "it is time for me to get off the truck."  (Id. at 69-74.)  Kelley called his dispatcher, Sheryle Puckett, and informed her of the situation.  (See id. at 80.)  Plaintiff

_____

[7] Defendant contends that Kelley suggested that plaintiff use the restroom outside because it was their custom to relieve themselves on the back of the truck.  (See Dep. of Harold M. Kelley 57-58.)

[8] Plaintiff did not discuss this incident with Kelley until after they had driven to their designated delivery point and unloaded the truck.  (See id. at 68.)

contacted Al Snells, his immediate supervisor,[9] and stated that he wanted off Kelley's truck but did not explain the reason to Snells. (See id. at 80-82.) This was the first time plaintiff had complained about Kelley to Snells or anyone else at Swift, other than once to a driver whose name plaintiff cannot remember. (See id. at 83-85.) Snells offered plaintiff the option of returning by bus, but plaintiff chose to ride back with Kelley to Georgia. (See id. at 80-82.)

After returning to the Georgia terminal, plaintiff met with Al Snells and Carl Foster and plaintiff provided a written statement detailing his complaints about Kelley. (See id. at 94-95.) Plaintiff alleges that during this meeting, Snells and Foster told plaintiff that "this ain't the first time this happened with [Kelley]."[10] (Id. at 91-92.) After receiving plaintiff's written statement, Snells and Foster promptly removed plaintiff from Kelley's truck, (see id. at 97), and provided plaintiff with accommodations until he could be assigned to a new trainer, (see id. at 99). Snells and Foster reported the

---

[9] Snells told plaintiff earlier that "if you have any problems with your trainer or anything like that, call me." (Id. at 86.)

[10] Defendant contends that Swift was not aware of any other allegations of race discrimination against Kelley before plaintiff's complaint. (Aff. of Tim Harrington; Aff. of Kirk Williams; Dep. of Harold M. Kelley 44.)

incident to the Area Sales Manager, Tim Harrington, who met with Vice-President Kirk Williams, Foster, Puckett, and Snells. (See Aff. of Tim Harrington.)  They concluded that Kelley had violated company policy, immediately reassigned plaintiff to a new trainer, suspended Kelley from training status for ninety days (which resulted in a $4,000 monetary penalty), required him to attend harassment training, and warned him that any future problems of the same nature would result in his termination. (See Aff. of Tim Harrington; Aff. of Kirk Williams.)  Plaintiff had no problems with his new trainer, completed training, and never encountered Kelley again after returning to the Georgia terminal with him.  (See Dep. of Jerome Giddens at 109, 156; Aff. of Tim Harrington.)

On October 26, 1998, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging racial discrimination in the form of a hostile working environment.  (See EEOC Charge No. 130990358.) Subsequently, the EEOC issued plaintiff a right to sue letter dated January 29, 1999.  (See Notice of Right to Sue for EEOC Charge No. 130990358.)  Plaintiff then timely filed his complaint in the present action on April 22, 1999.

### IV. Applicable Substantive Law and Analysis

As noted earlier, plaintiff's complaint contains the

12

following claims: (1) racial discrimination in the form of harassment under Title VII; (2) racial discrimination in the form of harassment under 42 U.S.C. § 1981; (3) negligent training, supervision, and retention under state law; and (4) outrage under state law. (See Compl. Counts I, II, V, VI.)  Defendant's motion for summary judgment asserts that no genuine issue of material fact exists and that defendant is entitled to judgment as a matter of law.  (See Def.'s Mot. Summ. J.)  The court will first address the federal law claims.[11]

## A.   Existence of Hostile Environment

Plaintiff asserts a claim of racial harassment predicated upon a hostile work environment created by a supervisor's actions.  Title VII provides that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis suppled).  Title VII permits a claim against an employer for a hostile work environment.  See Burlington Indus.,

---

[11] The court's discussion addresses both plaintiff's Title VII claim and the Section 1981 claim.  The analysis for Title VII claims and Section 1981 claims of racial discrimination in the form of harassment is the same.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  A claim of hostile work environment, as relevant here, requires a showing that (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon race; and (4) the harassment complained of affected a term, condition, or privilege of employment.  See Henson v. City of Dundee, 682 F.2d 897, 903-04 (11th Cir. 1982). If a plaintiff fails to make a prima facie showing of hostile work environment, the court need not even reach the question of employer liability.

In order for a plaintiff to establish a prima facie case of "hostile work environment" harassment actionable under Title VII, the incidents of harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment . . . .'"[12]  Faragher, 524 U.S. at 786 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Edwards v. Wallace Community College, 49 F.3d

_____

[12] Although both Faragher and Meritor involved claims for sexual harassment, not racial harassment as alleged in this case, the Supreme Court has noted that "[even though] racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."  Faragher, 524 U.S. at 787 n.1.

1517, 1521 (11th Cir. 1995).  Title VII is not "a general
civility code" nor does it protect against "'the ordinary
tribulations of the workplace, such as the sporadic use of
abusive language, gender-related jokes, and occasional teasing.'"
Faragher, 524 U.S. at 788 (citing B. Lindemann & D. Kadue, Sexual
Harassment in Employment Law 175 (1992)(footnotes omitted)).
Infrequent or "isolated incidents (unless extremely serious) will
not amount to discriminatory changes in the 'terms and conditions
of employment'" to constitute a violation of Title VII.[13]
Faragher, 524 U.S. at 788 (citation omitted).  The severity of
the behavior in each case must be evaluated both objectively[14]
and subjectively considering all the circumstances, see Oncale v.
Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and only
the most extreme harassing conduct will be found to violate Title
VII,  see Faragher, 524 U.S. at 788; Oncale, 523 U.S. at 81-82.

The standard for a racially hostile environment is high:
"[not] all racial slurs rise to the level of a Title VII

---

[13] However, the determination as to whether the harassment
was sufficiently severe or pervasive should not be based solely
on the number of incidents alleged.  See Vance v. Southern Bell,
863 F.2d 1503, 1510 (11th Cir. 1989).

[14] The objective evaluation is based on a "reasonable
person" standard.  See Watkins v. Bowden, 105 F.3d 1344, 1355-56
(11th Cir. 1997) (affirming the use of the "reasonable person"
standard in a hostile work environment claim where the plaintiff
argued that the court should have applied a more contextual
standard such as "a reasonable African-American person.")

15

violation." <u>Johnson v. Bunny Bread Co.</u>, 646 F.2d 1250, 1257 (8th Cir. 1981). "The racial slurs allegedly spoken by co-workers [have] to be so 'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'" <u>Edwards</u>, 49 F.3d at 1521 (citing <u>E.E.O.C. v. Beverage Canners, Inc.</u>, 897 F.2d 1067, 1068 (11th Cir. 1990)). The Supreme Court has noted that the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor</u>, 477 U.S. at 67). Factors to be considered include the frequency of the racial terms, whether the speaker directed the comments to the plaintiff,[15] and whether the worker made the remarks accidentally and/or as part of casual conversation. <u>See</u> <u>Bunny Bread</u>, 646 F.2d at 1257. Also relevant is whether the utterance was made in the presence of others so as to further humiliate the employee. Racial slurs that are "largely the result of individual attitudes and relationships . . . certainly [are] not to be condoned, [but nonetheless] do not amount to violations of Title VII." <u>Id.</u>

---

[15] Remarks that were not directed at the plaintiff may still contribute to the hostile environment if the plaintiff was aware of that conduct while actually employed by defendant. <u>See</u> <u>Edwards</u>, 49 F.3d at 1522.

16

The severe, pervasive conduct alleged by plaintiff consists of incidents such as Kelley's use of the word "nigger" twice in the presence of, but not directed at, the plaintiff, (see Dep. of Jerome Giddens 29, 39), Kelley's refusal to allow plaintiff to enter his home to use the restroom, (see id. at 62-65), and Kelley's reference to Hispanics as "wetbacks," (see id. at 50). This conduct hardly rises to the level of a hostile work environment.  Taken as a whole, Kelley's statements were not directed at the plaintiff, were infrequent, and were generally made as casual conversation or jokes.[16]  The undisputed facts indicate that the work atmosphere was neither "charged with racial hostility" nor abusive.  Edwards, 49 F.3d at 1521.  The Supreme Court has repeatedly emphasized that this cause of action is limited to extreme work conditions.  See, e.g., Faragher, 524 U.S. at 788; Oncale, 523 U.S. at 81.

Additionally, although the plaintiff presented evidence that Kelley repeatedly cursed and yelled at him, (see Dep. of Jerome Giddens 38-39), those incidents are not relevant to the determination of whether a hostile work environment existed. Because Title VII does not regulate the general civility of

---

[16] It appears that Kelley apologized to plaintiff for his comments when the plaintiff informed Kelley that the comments were offensive. (See Dep. of Jerome Giddens 30, 41, 49).

17

employees, see Faragher, 524 U.S. at 788, conduct that may be counted as contributing to a hostile environment must be of a race-related nature and not "[i]nnocuous statements or conduct" that bear no relation to race, see Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000).  The Eleventh Circuit has noted that, although courts examine the "totality of the circumstances" when determining whether the statements were sufficiently severe or pervasive, the statements analyzed must include race-related connotations to be actionable.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1242, 1247-48 (11th Cir. 1999) (en banc).  Kelley's cursing and yelling at plaintiff, although harsh, was not of a race-related nature and thus cannot be characterized as creating an "atmosphere charged with [race-based] hostility."  E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990).

Although the plaintiff is within the class protected from racial harassment and any harassment was unwanted, plaintiff has failed to sufficiently demonstrate that any harassment was so severe as to affect a term or condition of employment.  See Henson v. City of Dundee, 682 F.2d 897, 903-04 (11th Cir. 1982) (listing elements of hostile environment claim); see also Edwards, 49 F.3d at 1521-22 ("In deciding whether a hostile environment was created, factors to consider include the

18

frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work.")  Taking as true all of the conduct allegedly undertaken by Kelley during plaintiff's training, the Court concludes that the incidents described by plaintiff are ignorant, unprofessional, and mean-spirited, but they are not so severe, threatening, or disruptive as to rise to the egregious level required to create an actionably hostile work environment.

Because plaintiff has failed to put forth a prima facie case of hostile environment racial discrimination, defendant's motion for summary judgment is due to be granted with respect to plaintiff's Title VII and Section 1981 claims for racial discrimination in the form of harassment.

**B.   Employer Liability for Racial Harassment**

Alternatively, even if the court is in error and the incidents in plaintiff's case are sufficiently severe to constitute a hostile work environment, plaintiff's Title VII and Section 1981 claims of racial harassment cannot survive summary judgment.

Employer liability for actionable racial discrimination in the form of harassment depends upon whether the harassing worker

19

is the victim's supervisor or merely a co-employee.  <u>See</u>
<u>Faragher</u>, 524 U.S. at 805-07.  An employer is subject to
vicarious liability for the actionable hostile environment
created by the victim's <u>supervisor</u>.  <u>See</u> <u>id.</u> at 807.  Although
Title VII provides no definition of the term "supervisor," the
<u>Faragher</u> opinion indicates that the heightened liability applied
in a supervisor context exists because a supervisor has "special
authority enhancing [his] capacity to harass," <u>id.</u> at 800, which
may be "'to hire and fire, and to set work schedules and pay
rates . . . ,'" <u>id.</u> at 803 (citation omitted).  Circuit courts
have expounded upon the Supreme Court's definition of
"supervisor" and noted that "the essence of supervisory status is
the authority to affect the terms and conditions of the victim's
employment."  <u>Parkins v. Civil Constructors of Illinois, Inc.</u>,
163 F.3d 1027, 1034 (7th Cir. 1998); <u>see</u> <u>also</u> <u>Lissau v. Southern</u>
<u>Food Serv., Inc.</u>, 159 F.3d 177, 179 (4th Cir. 1998) (applying
supervisor liability when the harasser "could hire and fire
[employees]"); <u>Deffenbaugh-Williams v. Wal-Mart Stores, Inc.</u>, 156
F.3d 581, 592 (5th Cir. 1998)(holding that an employee was a
victim's supervisor where he had the authority to discharge her);
<u>Phillips v. Taco Bell Corp.</u>, 156 F.3d 884, 888 (8th Cir. 1998)
(finding that the harasser was a supervisor because he was the
store manager with authority over the plaintiff).  Absent the

20

authority to "hire, fire, demote, promote, transfer, or discipline an employee," a harasser will not qualify as a supervisor to impute vicarious liability on the employer. Parkins, 163 F.3d at 1034.

In this case, there is simply no evidence to support plaintiff's position that Kelley was his supervisor.  Plaintiff cannot impose vicarious liability on defendant for the acts of Kelley because he is not a supervisor.[17]  The acts of supervisors, starting with Snells up to Vice-President Williams, are not the basis of plaintiff's claims, and for good reason. The supervisors' response was immediate and appropriate once they had notice of plaintiff's experiences with Kelley.

Even if Kelley did qualify as a "supervisor," if no tangible employment action is taken,[18] an employer may assert an affirmative defense to the hostile environment claim.  See Faragher, 524 U.S. at 807.  The affirmative defense as outlined by the Supreme Court in Faragher requires proof of two necessary

---

[17] See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1363-64 (11th Cir. 1999).

[18] A tangible employment action includes any significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  In this case, no tangible employment action was taken and thus the affirmative defense applies.

elements by a preponderance of the evidence.  <u>Id.</u>  First, the
defendant must prove "that the employer exercised reasonable care
to prevent and correct promptly any sexually harassing behavior."
<u>Id.</u>  Typically the first element is proven by demonstrating that
(a) the employer established a clear policy against harassment in
the workplace;[19] (b) that such policy was fully communicated to
its employees;[20] and (c) that such policy provided a reasonable
avenue for the plaintiff to make a complaint to a management
official, other than the harassing supervisor.[21]  The second
element may be satisfied <u>either</u> by proving "that the plaintiff
employee unreasonably failed to take advantage of any preventive
or corrective opportunities provided by the employer or to avoid
harm otherwise,"  <u>id.</u>, <u>or</u> by showing that the defendant responded
by taking reasonable and corrective action when the plaintiff

---

[19] Promulgation of an anti-harassment policy "is not
necessary in every instance as a matter of law, [but] the need
for a stated policy suitable to the employment circumstances may
appropriately be addressed in any case when litigating the first
element of the defense." <u>Faragher</u>, 524 U.S. at 807.

[20] An employer who "had entirely failed to disseminate its
policy against [] harassment among [its] employees" is unable to
utilize the affirmative defense. <u>Faragher</u>, 524 U.S. at 808.

[21] Anti-harassment policy procedures that provide "multiple
avenues of lodging a complaint to assessable, designated
representatives" and do not require "that the employee complain
to the offending supervisor or though the supervisor's chain of
command" are sufficient under the affirmative defense. <u>Madray v.
Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1299 (11th Cir. 2000).

22

took advantage of the preventive or corrective opportunities
provided by defendant.[22]

   In this case, if Kelley is regarded as plaintiff's
supervisor as the plaintiff claims,[23] the undisputed evidence

_____

   [22] Although the affirmative defense only expressly includes
the former requirement, that a plaintiff unreasonably failed to
avoid harm, this appears to be incomplete.  The Supreme Court, in
adopting the safe harbor defense, acknowledged an employer's
"affirmative obligation to prevent violations" and sought to
"give credit here to employers who make reasonable efforts to
discharge their duty."  See Faragher, 524 U.S. at 806.  By
recognizing the employer's reasonable efforts to correct reported
harassment as part of the affirmative defense, this court
furthers the Supreme Court goal of encouraging employers to
provide a clear harassment policy that allows immediate reporting
by a victim.  See id.
   The Eleventh Circuit included the second option of
demonstrating the "employer's reasonable care to correct promptly
[] harassment" in their analysis of the affirmative defense,
noting that "'the employer's notice of the harassment is of
paramount importance [because] if the employer had notice of the
harassment . . . then it is liable unless it took prompt
corrective action.'"  Madray, F.3d at 1299 (citing Dees v.
Johnson Controls World Servs., 168 F.3d 417, 422 (11th Cir.
1999)).

   [23] As noted earlier, the undisputed facts indicate that
Kelley served merely as a trainer for plaintiff, (see Dep. of
Jerome Giddens 19-20) and had no supervisory authority to "hire,
fire, promote, demote, discipline, or alter the terms of
employment of any employee," (Aff. of Tim Harrington; Aff. of
Kirk Williams).
   As a general rule, if the harasser is merely a co-employee
of the plaintiff, a negligence standard applies, imposing
employer liability only when the employer knew or should have
known about the harassment and failed to take remedial action.
See Faragher, 524 U.S. at 799 (noting that District Courts and
Courts of Appeals have "uniformly judg[ed] employer liability for
co-worker harassment under a negligence standard" and citing
numerous cases, including Fleming v. Boeing Co., 120 F.3d 242,
246 (11th Cir. 1997)); see also Dees v. Johnson Controls World

indicates that defendant exercised reasonable care to prevent and
correct promptly the reported harassment.  Defendant acted
reasonably to prevent harassment by establishing a clear policy
against harassment[24] and incorporating that policy into the <u>Swift
Policies and Procedures Driver Handbook</u>.  (<u>See</u> Def.'s Ex. 4 to
Dep. of Jerome Giddens 14-15.)  During orientation, defendant
disseminated a copy of the <u>Swift Policies and Procedures Driver
Handbook</u> to plaintiff, at which time plaintiff signed a paper

---

<u>Servs.</u>, 168 F.3d 417, 421 (11th Cir. 1999).  Recently, the
Eleventh Circuit applied direct liability to an employer under a
negligence theory in a hostile environment claim involving co-
employees.  <u>See</u> <u>Coates v. Sundor Brands, Inc.</u>, 164 F.3d 1361,
1363-64 (11th Cir. 1999) (holding that, while the employee
adequately placed the employer on notice, the employer also
responded reasonably to the complaint).

    In this case, if Kelley is regarded as a co-employee, the
evidence suggests that upon notice of the harassment, defendant
took prompt action to remedy the situation.  After all of the
alleged harassment incidents had occurred, plaintiff informed his
immediate supervisor that a problem existed and subsequently
provided a written statement detailing his complaints about
Kelley.  (<u>See</u> Dep. of Jerome Giddens 80-82, 94-95).  Insufficient
evidence exists to indicate that defendant knew or should have
known about Kelley's harassment prior to plaintiff's official
report.  Once defendant had notice of Kelley's behavior, Swift
promptly removed plaintiff from Kelley's truck, (<u>see</u> <u>id.</u> at 97),
provided plaintiff with accommodations until he could be assigned
to a new trainer, (<u>see</u> <u>id.</u> at 99), suspended Kelley from trainer
status for 90 days, (<u>see</u> Dep. of Harold M. Kelley 81), and
required that Kelley watch a harassment tape, (<u>see</u> <u>id.</u> at 79-80).


[24] The definition of "harassment" located in defendant's
policy included "sexual harassment, as well as harassment based
on such factors as gender, race, color, religion, national
origin, ancestry, age, disability, or veteran status."  (Def.'s
Ex. 4 to Dep. of Jerome Giddens 14-15.)

acknowledging receipt of the handbook and promising to read the handbook and contact Human Resources with any questions. (See Def.'s Ex. 3 to Dep. of Jerome Giddens 14-15.)  The policy provided a reasonable avenue for complaint by instructing victims of harassment to call the director of human resources at the listed phone number.[25] (See Def.'s Ex. 4 to Dep. of Jerome Giddens 14-15.)  Furthermore, defendant provided plaintiff with the phone numbers of several persons to call should he encounter problems while on the road.  (See Dep. of Jerome Giddens 20-24.)

Once defendant received notice of the alleged harassment of plaintiff, the undisputed evidence shows that defendant acted promptly to remedy the situation.  Defendant removed plaintiff from Kelley's truck without delay, (see id. at 97), provided plaintiff with accommodations until he could be assigned to a new trainer, (see id. at 99), suspended Kelley from trainer status for 90 days, (see Dep. of Harold M. Kelley 81), and required that Kelley watch a harassment tape, (see id. at 79-80).  The undisputed facts indicate that defendant acted reasonably to

---

[25]    Swift's harassment policy is similar to the policy in Coates, which provided that "[a]ny employee who feels he or she is being [] harassed should immediately contact their line manager, Personnel Contact, or other manager with whom they feel comfortable."  164 F.3d at 1364.  The Eleventh Circuit found that the employer in Coates "clearly specified the steps a victimized employee should take to alert the employer of harassment."  Id.

prevent and correct the alleged racial harassment reported by plaintiff.

Because defendant affirmatively demonstrated that Swift exercised reasonable care to prevent and correct the alleged harassment, defendant's motion for summary judgment is, for that reason, also due to be granted with respect to plaintiff's Title VII and Section 1981 claims for racial discrimination in the form of harassment.

In summary, the Court finds that no material issues of fact remain and that defendant Swift Transportation Company, Inc. is entitled to judgment as a matter of law as to all federal claims asserted by plaintiff. A separate Final Judgment as to these claims will be entered. Pursuant to 28 U.S.C. § 1367 (c)(3), the court will decline to exercise supplemental jurisdiction over the state law claims and a separate order dismissing those claims will be entered.

DONE this *18th* day of *August*, 2000.


SENIOR UNITED STATES DISTRICT JUDGE

26